DEL NORTE NATURAL GAS COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Del Norte Natural Gas Co. v. Commissioner
Docket No. 9286-79.
United States Tax Court
T.C. Memo 1983-454; 1983 Tax Ct. Memo LEXIS 333; 46 T.C.M. (CCH) 914; T.C.M. (RIA) 83454; August 3, 1983. Robert M. Doby, Jr.,Henry W. Simon, Sr., and Joe K. Gordon, for the petitioner. Richard D. Ames, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax for the taxable years as follows: Year
Deficiency
1970
$11,179.40
1971
1,878.30
1972
3,859.21
1973
75,018.00
1974
47,829.58
The issues for decision are: (1) whether petitioner-corporation is entitled to a bad debt deduction of $443,242.30 for the taxable year 1973, resulting from a write-off of funds previously lent to a Mexican corporation; in the alternative, (2) whether petitioner is entitled to a partial bad debt deduction for taxable year 1973; (3) whether petitioner received additional interest income during the taxable year 1974 in the amount of $84,000. [1]
FINDINGS *335 OF FACT Some of the facts have been stipulated. The stipulation of facts and stipulated exhibits are incorporated herein by this reference. The petitioner, Del Norte Natural Gas Company (Del Norte), is a corporation organized and existing under the laws of the State of Texas. Del Norte Management Company (Management) is also a Texas corporation whose capital stock is wholly owned by Del Norte. From time to time, Del Norte and Management will be referred to together as petitioner. At the time of the filing of the petition in this proceeding, both Del Norte's and Management's principal places of business were in El Paso, Texas. For the taxable years 1970 through 1974, Del Norte and Management filed consolidated U.S. Corporation Income Tax Returns in Austin, Texas. John L. Harlan was president and majority shareholder of Del Norte, owning 96.8 percent of its outstanding stock, during the taxable years in issue. He has been involved in all phases of the oil and gas industry (production, refining, marketing) since 1948. In 1964, Mr. Harlan was contacted by members of the Caraveo family, residents of the State of Chihuahua, Republic of Mexico. The Caraveo family asked Mr. *336 Harlan to join with them in forming a corporation to distribute natural gas in Juarez, Mexico. In return for his financial assistance, Mr. Harlan would receive a 50-percent ownership interest in the corporation. At that time, however, Mexican counsel advised Mr. Harlan that the laws of Mexico prohibited foreigners from owning any part of a Mexican public utility. In 1964, the Caraveo family formed Gas Natural de Juarez, S.A. (Gas Natural), a corporation organized under the laws of the Republic of Mexico. The initial shareholders of Gas Natural and the approximate percentage of their respective holdings were as follows: Percentage
Shareholder
Owned
Don Graciano Caraveo
20
Alfonso Caraveo
40
Saul Caraveo
20
Ruben Chaves
20
Mr. Harlan's discussions with the Caraveos and Gas Natural were formalized in a letter agreement between Mr. Harlan and Gas Natural, dated April 30, 1965. Under the terms of this letter, Mr. Harlan and Gas Natural agreed as follows: Mr. Harlan would--(1) finance the construction of a gas distribution system for Gas Natural, (2) in return for a fee, provide technical and managerial services to Gas Natural, and (3) sell to Gas Natural, *337 natural gas for distribution in Juarez. Del Norte was subsequently incorporated on June 9, 1965, and Management on September 14, 1965. Following the organization of Del Norte and Management, John Harlan assigned his rights under the April 30, 1965, letter agreement to both corporations. The outstanding capital stock of Del Norte was owned as follows: Percentage of
Individual/Corporate Officer
Stock Ownership
John Harlan (President)
96.8
B. R. Parks (Vice-President)
.7
Others
2.5
Petitioner-corporation entered into three agreements with Gas Natural: (1) a Development Loan Contract, (2) a Technical Assistance Contract, and (3) a Gas Purchase Agreement. All of these documents were executed on February 15, 1966. In the Development Loan Contract, petitioner agreed to lend funds to Gas Natural for use in constructing a natural gas distribution system in Juarez Mexico. The Technical Assistance Contract provided that Management would give technical assistance to Gas Natural in exchange for 4 percent of Gas Natural's gross receipts. The Gas Purchase Agreement named petitioner as supplier of natural gas to Gas Natural. The Development Loan Contract *338 provided, among other things, as follows: (a) Management would extend a loan to Gas Natural up to a maximum of $800,000, U.S. currency. (b) Gas Natural would use the proceeds of this loan to construct its gas distribution system in Juarez. (c) Gas Natural would pay interest on the outstanding amount of the loan, at the rate of 10 percent per annum, beginning January 1, 1966. (d) The entire principal proceeds of the loan were to be repaid by Gas Natural no later than March 31, 1975. (e) Gas Natural granted to Management a first mortgage lien on the gas distribution system to be constructed in Juarez. (f) The shareholders of Gas Natural were to pledge 1,000 fully paid shares of Gas Natural's stock to Del Norte as additional security for the loan. In accordance with the agreements between petitioner and Gas Natural and as a result of subsequent loans between September 1965 and May 1969, petitioner lent Gas Natural a total of $1,629,179.62. These loans were made in various amounts and on various dates during this period. As security for these loans, the owners of all the outstanding capital stock of Gas Natural executed a document entitled "Collateral Pledge Agreement" *339 on February 15, 1966. In addition to this security agreement, Gas Natural executed a mortgage on all its property to secure the loans made to it by petitioner. All loans made by petitioner to Gas Natural were evidenced by promissory notes. Under the terms of the Technical Assistance Contract, the parties agreed, in general, as follows: (a) Management would furnish to Gas Natural all technical assistance and advice required by Gas Natural for the design, construction, and operation of the natural gas distribution system. (b) Management would, upon request, send qualified technical personnel to Mexico to carry out the technical assistance. (c) Gas Natural would pay Management, in monthly installments, an amount equal to 4 percent of Gas Natural's gross income. The terms of the Gas Purchase Agreement (Natural Gas Contract) with Gas Natural were as follows: (a) Del Norte agreed to supply all of Gas Natural's natural gas requirements for its residential, commercial, and industrial customers in the city of Juarez. (b) This gas was to be of merchantable quality and delivered at adequate pressure for Gas Natural's use. (c) Gas Natural would pay an agreed rate for the gas, *340 but the rate was subject to adjustment if Del Norte's costs for such gas were increased or decreased by a minimum stipulated amount. (d) Gas Natural was to pay for its gas monthly, in U.S. currency. In addition, the contract also provided in part: Seller * * * shall have the right, after having given five (5) days notice to Buyer, to discontinue the supply of gas to Buyer whenever any monthly bill * * * remains delinquent for a period of fifteen (15) days * * * and if Buyer violates any of the other terms or conditions of this contract * * * Seller shall have the right to terminate this contract by written notice to Buyer.
In order to sell gas to Gas Natural, petitioner had to obtain a Presidential permit from the U.S. Federal Power Commission. This permit provided in relevant part: (d) Del Norte shall not, during the term of the authorization granted by the order, materially change or alter its export operations without first obtaining the permission and approval of the Commission. During 1966, there were two natural gas distributors in Juarez, Mexico. Juarez Gas Company (Juarez Gas) served the older parts of the city. Its gas distribution system was leaky and inefficient. *341 Gas Natural serves approximately 30,000 families in the suburbs and newer parts of Juarez. Petitioner purchased, on February 17, 1966, from Southern Union Gas Company, the right to sell natural gas to Juarez Gas. Construction of the natural gas distribution system proved much more costly than was originally estimated. As a result, Gas Natural was heavily in debt to petitioner before gas began to flow across the border. Construction of the gas distribution system was still underway at least until 1968, and it is not clear when gas sales to Gas Natural actually began. In order to complete the gas distribution system, Gas Natural needed additional funds which petitioner did not have the resources to provide. To obtain these funds, petitioner borrowed, in 1967, funds from R.J. Levy, Harris, Inc., (Harris) and the American National Insurance Company (American). Petitioner and Mr. Harlan entered into an agreement with Harris in which Harris lent $225,000 to petitioner. As part of this loan agreement, petitioner executed subordinate promissory notes, and Harris was given an option to purchase stock in Del Norte and Management equivalent to one-sixth of the outstanding stock *342 in each corporation. This option expired on December 31, 1975. Petitioner obtained a loan in the amount of $675,000 from American on February 1, 1968. The loan agreement provided for issuance of a 7-1/2 percent senior secured note, secured by, among other assets, oil and gas properties owned individually by John Harlan. Del Norte and Management granted to American, as part of the consideration for the loan, an option to purchase 14 percent of the outstanding capital stock of both corporations. This option expired on December 31, 1975. These amounts borrowed by petitioner were then lent to Gas Natural and used by it to pay for a portion of the construction costs of the gas distribution system for natural gas in Juarez, Mexico.
By May 1969, Gas Natural owed Del Norte and Management a total debt of $1,629,179.62, all of which was evidenced by promissory notes, secured by collateral pledge agreements and mortgages on the gas distribution system. In an attempt to put Gas Natural on a firmer financial footing, Gas Natural borrowed $1.2 million in U.S. currency from Banco Nacional de Obras y Servicos Publicos (Banco Nacional) in May 1969. The proceeds of this loan were used to *343 reduce Gas Natural's outstanding debt to Del Norte and Management from $1,629,179.62 to $429,179.62. Banco Nacional, a branch of the Bank of Mexico, lends money to railroads, utilities, and other public service companies. In order for Gas Natural to obtain this loan from Banco Nacional, Del Norte and Management were required to release their mortgages on the assets of Gas Natural. In exchange for the release of their mortgages, Del Norte and Management received in 1969 a personal note from the majority shareholder of Gas Natural, Don Graciano Caraveo, a 40-percent shareholder in Gas Natural, and subordinated mortgages on Gas Natural's gas distribution system which were junior to the mortgages of Banco Nacional. Banco Nacional also required Gas Natural to increase its capitalization. Don Graciano Caraveo purchased additional shares in Gas Natural and distributed them among his family. These shares were pledged to the bank as further collateral. Banco Nacional further required that Gas Natural reduce its management fee to petitioner from 4 percent to 2 percent. As of October 1, 1971, the total debt of Gas Natural to petitioner was $943,033.90. This amount consisted of a *344 $400,000 note balance and $543,033.90 unpaid gas sales and accrued interest. After some negotiation, this debt was restructured. On October 6, 1971, Gas Natural executed a promissory note payable to Del Norte in the amount of $693,332.30. The difference between $943,033.90 and $693,332.30 was reflected on the books and records of petitioner as an account receivable. In order to obtain this note from Gas Natural, petitioner released the personal promissory note executed by Don Graciano Caraveo in 1969 and eliminated the management fee which Management charged Gas Natural. This October 6, 1971, promissory note from Gas Natural to Del Norte bore interest at the rate of 10 percent, plus a penalty interest on past due payments at 11 percent. The note called for monthly payments of $5,000 plus accrued interest. The original amount of this note was $693,332.30. On November 15, 1971, Gas Natural paid $5,000. Petitioner credited this payment against the principal of the note, leaving a balance of $688,332.30. Gas Natural, however, owed Del Norte approximately $26,100 in interest alone.This November 15, 1971, payment was the only one until October 1973. In 1971 and 1972 petitioner *345 wrote off $134,280 and $110,810, respectively, as worthless. This left a remaining book value for the debt of $443,242.30 going into 1973. This remaining $443,242.30 is the bad debt deduction in issue. On March 1972, petitioner held a Board of Directors meeting to discuss the situation. At that time Mr. Harlan concluded that Gas Natural was (in the layman's sense) bankrupt. At this meeting the Directors discussed the debt owed by Gas Natural and options for dealing with the situation. Among the possibilities they considered, were forcing Gas Natural into bankruptcy or filing an "embargo," a procedure similar to a receivership. An embargo is a Mexican legal proceeding imposed by the Mexican court in which an "intervenor" is appointed. This individual has the authority to approve or reject all expenditures of the embargoed company. An embargo does not alter the priorities of any secured or unsecured creditors, nor is it an attachment or a "taking over" of the company's assets by a Mexican court. Rather, it is a procedure whereby the creditor seeking the embargo obtains control of the disbursements or expenditures of the debtor's funds. The Board of Directors rejected formal *346 bankruptcy as an alternative proceeding because they believed petitioner could recover more through the embargo and did so by filing a pleading on March 11, 1972. Del Norte nominated as "intervenor-special auditor," Mr. Guillermo Orozco, an employee of petitioner both prior to and during the period he acted as "intervenor-special auditor." The Mexican district court approved his nomination. Mr. Orozco prepared and filed monthly financial statements with the Mexican district court regarding Gas Natural. Mr. Orozco is a Mexican citizen with an educational background in business administration including basic accounting. As intervenor, Mr. Orozco handled virtually all of the cash that came into Gas Natural and had sole authority to sign checks and approve disbursements. By eliminating waste and cutting spending, Mr. Orozco was able to accumulate some funds in Gas Natural's account. Between the 18-month period from March of 1972 and October 1973, he accumulated 1,800,000 pesos. [2]
Beginning in 1973, representatives from Banco Nacional, Del Norte, and Gas Natural *347 held a series of meetings. The parties agreed to extend the embargo for six months with Mr. Orozco continuing as intervenor, and to distribute the 1,800,000 pesos as follows: Percent
Amount Received
Creditor
Received
(in pesos)
Banco Nacional
67
1,206,000
Del Norte
28
504,000
Banco de Commercio
5
90,000
de Chihuahua
Total
100
1,800,000
The amount distributed to petitioner constituted a payment of interest. Shortly after these meetings, the 1973 Arab oil embargo began. As a result the price of oil and gas increased. Under the terms of its contract with Gas Natural, however, Del Norte was able to "pass through" this price increase. Gas Natural could not increase its prices without consent of the Mexican government. The Annual Report for Importers and Exporters of Natural Gas which reports Del Norte's sales to Gas Natural shows an increase from an average weighted price of 45.52 cents per million cubic feet in 1972 to 47.92 cents in 1973. On its Mexican federal income tax returns, Gas Natural showed a profit or loss and capital balances (in pesos) as follows: Year
Profit (Loss)
Capital Balance
1970
(1,397,909.91)
(3,531,000)
1971
(1,924,193.29)
(5,893,000)
1972
(748,091.88)
(7,124,000)
1973
(618,500.45)
(8,144,000)
1974
163,080.00 not shown *348 On June 1, 1974, Del Norte assigned Gas Natural's October 6, 1971, promissory note to John Harlan, Henry W. Simon, and B. R. Parks for a total consideration of $69,000. Mr Harlan paid 98 percent of the purchase price and received 98 percent of the promissory note. This assignment was retroactive to January 1, 1974. The note was assigned from Del Norte to Harlan, Simon, and Parks because Mr. Harlan felt that, should anything be collected on the note in the future, it would be due to his personal efforts and the result of negotiation and good relations. During the first half of 1974, Del Norte received interest of $84,000. These interest payments were recorded on petitioner's books and records as interest income. After the June 1, 1974, assignment, however, reversing entries were made on petitioner's books and records deleting the previously recorded interest income. Mr. Harlan reported his share of this interest on his personal income tax return for 1974, and paid tax on it.Mr. Harlan's 1974 individual income tax return was audited, and this audit resulted in a "no change" report. On its 1973 Federal corporate income tax return, petitioner claimed $443,242.30 as a bad debt *349 deduction. The Commissioner disallowed this deduction and also required petitioner to include the $84,000 of interest in income for taxable year 1974. OPINION The debtor, Gas Natural, is a Mexican corporation which supplies natural gas to the city of Juarez, Mexico.Petitioner, a domestic corporation, supplied the natural gas to Gas Natural. In 1966, petitioner entered into agreements with Gas Natural to advance to it large sums of money in order to construct a modern gas distribution system in Juarez. Petitioner states on brief that its goal was to sell gas to Gas Natural, make a profit on these sales, and recoup its loan at the same time. The original note provided for a balloon payment in 1975 with "interest only" payments beginning January 1, 1966. It took several years to construct the costly gas distribution system, and the source of the funds with which to pay the interest during construction is not explained. Gas Natural was greatly in debt even before gas began to flow through the system. From the start, Gas Natural was often late or delinquent on its interest payments. It is not entirely clear when gas sales to Gas Natural began, and it appears that construction *350 was still underway at least into 1968 when Del Norte borrowed additional money for construction cost overruns. In May of 1969, Gas Natural borrowed $1.2 million from a Mexican bank, Banco Nacional. All of the loan proceeds from Banco Nacional were paid to petitioner and reduced Gas Natural's indebtedness from $1,629,179.62 to $429,179.62. As part of the arrangement for this loan, petitioner had to agree to subordinate its security interest in Gas Natural's assets (principally the gas distribution system) to the security interest of Banco Nacional. On October 6, 1971, there was a restructuring of the debt. The outstanding balance at that time was $943,033.90 consisting of $400,000 remaining on the $429,179.62 note and $543,033.90 of accrued interest and unpaid gas bills. Gas Natural issued a new note for $693,332.30 and the balance was credited to a new account receivable. The new note was secured by a second mortgage on Gas Natural's distribution system. In November 1971, Gas Natural made a $5,000 payment of interest which petitioner credited to principal. In 1971 and 1972 petitioner wrote off $134,280 and $110,810, respectively, as worthless, leaving a remaining book value *351 of $443,242.30 going into 1973. Petitioner deducted this amount, the remaining $443,242.30, as a worthless debt in 1973. This is the bad debt deduction in issue. At a Board of Directors meeting of petitioner on March 7, 1972, the board discussed the collection problems petitioner was having with Gas Natural. At that meeting petitioner's board decided to seek an "embargo" against Gas Natural. March 11, 1972, petitioner filed a pleading in a Mexican district court to begin the embargo. Under the supervision of the "intervenor-special auditor," Gas Natural accumulated 1,800,000 pesos between March 1972 and October 1973. In October 1973, representatives from Banco Nacional, Del Norte, and Gas Natural held a series of meetings. They distributed the 1,800,000 pesos of which petitioner received 28 percent and agreed to extend the embargo for at least another six months. This case raises the frequently litigated factual question of whether a debt owed became worthless in a particular year, thereby entitling the taxpayer to a deduction as provided in section 166. [3]Section 166(a)(1) *352 allows a deduction for "any debt which becomes worthless within the taxable year." A determination of worthlessness requires proof by the taxpayer that the debt became worthless in whole or in part during the year claimed. Petitioner has the burden of proof on this issue. Rule 142(a); Boehm v. Commissioner,326 U.S. 287, 294 (1945). To carry this burden, petitioner must establish that the debt had some value at the beginning of the year for which the deduction is claimed and that something occurred during the year which caused petitioner to abandon any hope or expectation that it would become valuable at some future time. [4]Steadman v. Commissioner,50 T.C. 369, 376 (1968), affd. 424 F.2d 1 (6th Cir. 1970), cert. denied 400 U.S. 869 (1970). Generally, this burden is met by a showing of some "identifiable event" which clearly establishes the time the debt became worthless. *353 Dustin v. Commissioner,53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). It is frequently impossible to select a single factor which clearly establishes the date when a debt became worthless. More often it is a series of events which in the aggregate present a picture establishing that the debt in question has become worthless. Such a decision of necessity requires a practical approach, not a legal test. It must be flexible in nature, varying according to the circumstances of each particular case, so that whatever inferences a court might draw from a particular fact in another case are not binding on the examining court, although the same fact may be present. [Minneapolis, St. Paul & Sault Ste. Marie Railroad Co. v. United States,164 Ct. Cl. 226, 240-241 (1964). Citation omitted.] In making such a determination, the taxpayer must follow a rule of reason, falling somewhere in between the latest date an "incorrigible optimist" would choose and the earliest date a "stygian pessimist" would choose. United States v. S.S. White Dental Mfg. Co.,274 U.S. 398, 403 (1927); Ruppert v. United States,86 Ct. Cl. 396, 22 F. Supp. 428, 431 (1938). *354 The regulations acknowledge the difficulty often encountered by taxpayers and provide for consideration of "all pertinent evidence" in determining whether a debt is worthless. Sec. 1.166-2(a), Income Tax Regs.[5] The regulations further provide that a deduction is warranted if "the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment * * *." Sec. 1.166-2(b), Income Tax Regs. Thus, factors such as whether the debt is secured or unsecured, the relative priority of the taxpayer vis-a-vis other creditors, the solvency of the debtor, and whether legal proceedings have been instituted by the creditor may all be relevant to a determination of worthlessness. *355 Petitioner's primary argument is that the following facts, when viewed objectively, collectively establish that the debt of Gas Natural became totally worthless in 1973: the financial statements contained in the debtor's 1970 through 1973 Mexican income tax returns, the embargo proceedings instituted in 1972, and the Arab oil embargo. We shall consider each item individually. Petitioner argues that the financial statements attached to Gas Natural's 1970 through 1973 Mexican income tax returns indicate the debt became worthless in 1973. On brief, petitioner states: In 1973, Gas Natural was insolvent, and had been since at least 1970, its tax returns and financial statements for those years showing a negative net worth. We cannot conclude that the Mexican income tax returns establish that the debt became worthless in 1973. First, the mere fact that a business is on the decline, or that it failed to make a profit, or that its obligation may be difficult to collect, will not, without more, provide a creditor of that business with cause for treating its obligation as being worthless. *356 Riss v. Commissioner,56 T.C. 388, 407 (1971), affd. on this issue 478 F.2d 1160 (8th Cir. 1973). Second, we lack information sufficient to analyze the Mexican tax returns. We have no evidence as to underlying assumptions or calculations used in putting together the financial statements or in preparing the tax returns. We cannot assume a system of financial or tax accounting identical to our own. But even if we could determine that these returns pointed to insolvency, to the extent that Gas Natural's liabilities exceeded the book value of its assets, evidence of insolvency based upon book value of assets does not necessarily establish the worthlessness of a debt. Trinco Industries, Inc. v. Commissioner,22 T.C. 959, 965 (1954). Book value may or may not correspond to the fair market value of the enterprise or its assets.
Petitioner also maintains on brief that "the entire question of a secured position by Del Norte is not worthy of consideration." We disagree. The $443,242.30 debt in issue was secured by a second mortgage on Gas Natural's *357 gas distribution system. This second mortgage became subordinated to the lien of Banco Nacional as a condition of the $1.2 million loan. Petitioner made no attempt to enforce its lien. Instead, petitioner chose to institute the "embargo" in 1972 because it felt its subordinate position was of questionable value. A critical defect in petitioner's proof on this point is the absence of any evidence of fair market value of the debtor's principal asset--the gas distribution system--to compare with the outstanding liens. Without such evidence, it is virtually impossible for us to determine Gas Natural's net worth or whether it was in fact insolvent. Other evidence of petitioner's likelihood of collecting on the debt is conflicting. For example, by petitioner's own admission, Gas Natural was insolvent since at least 1970. This statement is inconsistent with worthlessness in 1973. We do know, however, that in 1973 petitioner was second in line to Banco Nacional to receive a distribution of pesos from the 1,800,000 accumulated by the intervenor. The payment of interest by a debtor is evidence *358 that the debt is not completely worthless. Easton Tractor & Equipment Co., Inc. v. Commissioner,35 B.T.A. 189, 195 (1936). Petitioner has failed to show that its debtor's financial situation in 1973 justified writing off the debt in that year as worthless. Petitioner next points to the existence of 1972 embargo proceedings as evidence of worthlessness in 1973. The mere fact of a receivership is not sufficient to prove worthlessness. Brimberry v. Commissioner,588 F.2d 975, 978 (5th Cir. 1979). In Brimberry,supra, the receivership and subsequent reorganization was for the purpose of marshalling and preserving the assets of the debtor who meanwhile continued its business. Where a business, though faltering markedly, has been able to perpetuate itself as a going concern, the courts have been reluctant to hold that its debts during such a period of decline were so irredeemable as to be considered worthless. Riss v. Commissioner,supra. Gas Natural was still a going concern in the year of the 1973 bad debt deduction, *359 as it was at the time of trial. And, although Gas Natural was financially troubled, the record showed that Gas Natural was likely to continue in operation for some time to come. It is the most modern gas distribution system in Juarez, serving over 30,000 families. The very nature of petitioner's business venture and the fact that principal was not due for almost ten years from the inception of the transaction is consistent with Gas Natural's future growth and viability. Petitioner admits it chose the embargo because it was likely to fare better under it than a bankruptcy. Its decision to opt for the embargo first, appeared to be a good one, because from March 1972 until October 1973 Gas Natural's ability to pay its debt improved. Furthermore, petitioner can be attributed with the knowledge, in October 1973, that the embargo, which had already run for a year and a half, would be extended for at least another six months. We conclude that the institution of the embargo does not aid petitioner in making its case for worthlessness in 1973. Petitioner also points to the 1973 Arab oil embargo as "objective evidence" of worthlessness in 1973. The Annual Report for Importers *360 and Exporters of Natural Gas, reporting Del Norte's sales to Gas Natural, however, shows an increase from an average weighted price of 45.52 cents per million cubic feet in 1972 to 47.92 cents in 1973 which is not so substantial as to create objective evidence of the oil embargo's impact on Gas Natural's debt. Petitioner has not provided us with any other tangible signs of the Arab oil embargo's impact upon the likelihood of collecting its debt from Gas Natural. After examining the foregoing facts, we are unconvinced that they collectively establish worthlessness of the debt. Finally, petitioner argues that evidence of events subsequent to the year of the debt write-off is irrelevant to the issue of worthlessness in a particular year. Petitioner is correct that, in examining the points upon which it relied to prove the debt worthless, we are limited to facts known at the close of the year 1973. Subsequent facts, however, may be used for the purpose of evaluating the soundness of petitioner's decision that the debt was worthless in 1973 but not as evidence of the fact of worthlessness. *361 New York Water Service Corporation v. Commissioner,12 T.C. 780 (1949); Dustin v. Commissioner,53 T.C. 491 (1969). In New York Water Service Corporation,supra at 792, we said: Where a creditor voluntarily advances further large sums to a debtor as petitioner did, it can hardly assert the worthlessness of the account on which the new advances were made. Respondent characterizes petitioner's continued sales of gas on credit as sales on "open account." Petitioner takes issue with this characterization and attempts to explain its continued dealings with Gas Natural as pursuant to the terms of its contract. The Natural Gas Contract between petitioner and Gas Natural, however, stated that Gas Natural was to pay for its gas in the month following delivery, upon being billed by Del Norte. Petitioner's contract, as Mr. Harlan acknowledged at the trial, provides that upon violation of any contract terms petitioner could terminate the contract by written notice to Gas Natural. Petitioner's claim that it could not stop supplying gas on *362 credit is, at best, unpersuasive. Petitioner also argues on brief that a cutoff of gas to Gas Natural would have endangered Del Norte's Presidential permit.The order of the Federal Power Commission, however, provided that, with "permission" and "approval" of the Commission, Del Norte could have discontinued its flow of gas. Petitioner's assertion that a shutoff of gas "would definitely have been a change in Del Norte's export operations, and might have resulted in punitive action (e.g., the cancelling of Del Norte's Presidential permit) by the Federal Power Commission" is without merit. Surely petitioner does not argue that the Federal Power Commission expected Del Norte to subsidize a Mexican corporation and the city of Juarez.Nor are we convinced that a "unilateral cutoff of natural gas by Del Norte would undoubtedly have had serious repercussions across the border and might well have caused an international incident." We are not persuaded that petitioner had "adequate reasons" for its continued business dealings and extensions of credit both during the taxable years in issue as well as in the years subsequent to the 1973 write-off. While we do not hold petitioner responsible *363 for seeing into the future, the fact of continued business dealings on credit is relevant and of probative value. Accordingly, we find petitioner's continued extensions of credit evidence inconsistent with a belief of total worthlessness in 1973. In light of the foregoing, we remain unpersuaded by petitioner's evidence. Petitioner has failed to sustain its burden of proving that the debt became wholly worthless in 1973. We hold for respondent on this issue. Petitioner argues in the alternative that if the bad debt in issue did not become totally worthless in 1973, then it should be allowed a partial bad debt deduction in 1973 in the amount of $374,242. This amount is the difference between petitioner's basis in the note ($443,242) and the $69,000 paid petitioner upon the sale of the note to Mr. Harlan and the others. In support of the argument, petitioner points to the fact that it wrote off the debt in 1971 and 1972, $134,280 and $110,810, respectively, and that these deductions were approved on audit. All taxpayers, petitioner argues, citing no precedent, have "the right to expect consistency from the government" and that "a deduction * * * will be accorded the same treatment *364 as in the past." Section 166(a)(2) provides that: When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. Petitioner has the burden of establishing that a debt becomes partially worthless in the year of the write-off. Findley v. Commissioner,25 T.C. 311, 318 (1955), affd. per curiam 236 F.2d 959 (3d Cir. 1956). Whether to allow a partial write-off is within the discretion of the Commissioner, and that discretion can be overturned only when the taxpayer shows that the Commissioner's decision is arbitrary or that he abused his discretion.In addition to showing that the Commissioner's determination was arbitrary or unreasonable, petitioner must also introduce evidence which establishes that the amount of worthlessness claimed could be predicted with "reasonable certainty" in the year the deduction was claimed. Wilson Bros. & Co. v. Commissioner,124 F.2d 606, 609-610 (9th Cir. 1941), affg. a Memorandum Opinion *365 of this Court. Petitioner has not met this burden. Mr. Harlan's own testimony is inconsistent with petitioner's claim: Q. Mr. Harlan, you stated earlier that as early as 1971, you believed that Gas Natural was bankrupt, I believe was the term you used. Now, * * * I'm not going to use that as a legal definition of bankruptcy but Mr. Harlan had his opinion as to the financial status of Gas Natural. Did you advise Del Norte's accountant to take any steps with regard to this outstanding loan? A. Yes sir. Q. What steps did you advise him to take?
A. Well, I considered them at least insolvent and with the profit margin they had, very little hopes of ever being able to make a profit from what I had seen in the past. I advised him that in my opinion, the note even at that time was worthless and that we should start charging the note off to get it off our books.
Q. Do you recall how much was charged off--it has been stipulated, but I'm asking you if you recall? A. Well, as I remember it, approximately $137,000. Q. Do you recall how that amount was chosen? A. Well, it's approximately 20 percent. Q. Was a similar amount written off in 1972?
*366 A. Yes, sir. Q. Was that also approximately 20 percent? Q. Yes, sir. After the first amount, the debt was reduced to that amount, then 20 percent of the balance was written off. With regard to the corresponding deductions on petitioner's Federal income tax returns, petitioner's president testified as follows: Q.Do you remember what the question was? A. Yes, it was about [the revenue agent's] advice. At the wrap-up of the audit, he called me in. He said he was approving the return and I think that's the procedure they normally do. They call you in and talk it over with you. He was approving the write-off and that if I had determined that this note was worthless, then I had, in his opinion, three years to charge that note off. So from that advice, I advised my accountant at the end of 1973, I says, "This is the third year, I want you to charge this note off." He did not question me. He charged it off. Now, since this has all come up, [sic] later asked further questions about this to my accountant. He said, "I didn't question you about it because there is a law that says when you have determined that a note is uncollectable, bad, that you do have to *367 charge it off in three years." I don't know the law. Anyway, I was advised by [the revenue agent] that I charge it off in three years. Irrespective of whether the revenue agent so advised Mr. Harlan, by his own admission, Mr. Harlan states that petitioner "thought" the debt was worthless in 1971 but that he mistakenly believed it could be charged off and deducted over a three-year period. This being the only evidence of partial worthlessness, it is insufficient for petitioner to meet its burden of proof; and we cannot, therefore, find respondent's determination plainly arbitrary or unreasonable. The final issue for decision concerns the interest payments made by Gas Natural to petitioner in the amount of $84,000 (U.S. currency), between February 9 and June 1, 1974. These interest payments were recorded on Del Norte's books as interest income. After the Gas Natural's October 6, 1971, note was assigned to Mr. Harlan, et al., on June 1, 1974, the interest was taken off the books of petitioner and distributed pro rata to the purchasers. Mr. harlan and the others reported this interest on their 1974 income tax returns. Petitioner did not include the $84,000 interest payment *368 in income in taxable year 1974. In his statutory notice of deficiency, the Commissioner increased petitioner's taxable income by $84,000, the amount of the interest income not reported. Section 61 provides that gross income means "all income from whatever source derived" and this includes interest. Sec. 61(a)(4). There is no dispute that prior to June 1, 1974, the promissory note was the property of petitioner. Petitioner argues that it may retroactively assign income by contractual agreement. This notion was disposed of over fifty years ago in Lucas v. Earl,281 U.S. 111 (1930). Accordingly, we hold that the income was taxable to the corporation [6] in the year received. Decision will be entered for the respondent.
Footnotes
1. Deficiencies for the remaining taxable years result from automatic adjustments caused by the disallowance of the 1973 bad debt deduction.↩
2. This is $144,000, U.S. currency, at 12.5 pesos per dollar, the approximate rate of exchange in October 1973.↩
3. Statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. References to "Rules" are to the Tax Court Rules of Practice and Procedure.↩
4. Respondent concedes that a valid debt existed.↩
5. See sec. 6511(d)(1) extending the statute of limitations for refund claims based upon worthless debts from three to seven years. We note that our determination as to worthlessness affects only the timing with regard to the deduction. It does not preclude petitioner from claiming the deduction in a later or earlier open year.↩
6. The matter of Mr. Harlan's remedies for interest erroneously taken into income in 1974 is not before us.↩